THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEON NOLDEN, Defendant-Appellant.

First District (4th Division)    No. 79-749

Opinion filed December 4, 1980.

534

Chester L. Blair, Chartered, of Chicago (Chester L. Blair and Gilbert C. Schumm, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Adrienne Nacev-Noble, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a bench trial in the circuit court of Cook County, defendant, Leon Nolden, was found guilty of aggravated battery and attempt murder (Ill. Rev. Stat. 1975, ch. 38, pars. 12—4, 8—4, 9—1). On appeal, defendant contends: (1) the trial court abused its discretion and committed reversible error by admitting evidence of defendant's prior conviction for unauthorized use of weapons; (2) the State failed to prove defendant guilty beyond a reasonable doubt; (3) the trial court abused its discretion and committed reversible error by denying defendant's motion for a new trial on the basis of newly discovered evidence; (4) the trial court erred in entering judgment on the jury's verdict of guilt on both the aggravated battery and the attempt murder charge; and (5) the trial court erred in sentencing the defendant on both the aggravated battery conviction and the attempt murder conviction.

We affirm the judgment as to attempt murder and vacate the conviction for aggravated battery.

At trial, McKinley Johnson, the complaining witness, testified that on January 23, 1978, at approximately 5 p.m., he arrived at his rented garage, located in an alley between Yale and Wentworth Avenues, near his home. Johnson opened the garage door and, when he returned to his car he saw an old Chevrolet car being driven towards him. Johnson stated there were no lighted street lights in the area, but artificial lighting was not necessary for him to see since there was still daylight at that time. As Johnson drove his car into the garage, the Chevrolet car stopped in front of his garage. When Johnson got out of his car, the man driving the Chevrolet, later identified as defendant, also exited from his car.

Johnson further asserted that defendant then asked him if he had jumper cables. After Johnson responded that he did not, defendant told Johnson, "[g]ive me your wallet or I'll blow your brains out." Johnson "started towards him," calling him a name, and defendant produced a gun and shot Johnson four times. Johnson stated that he was wounded in both arms, his hand, and his chest.

Johnson also testified that, during the initial part of the confrontation, he and defendant were standing face to face, "close enough to touch each other." Johnson demonstrated to the jury the distance and

noted that he backed away from defendant as defendant fired the gun at him. After shooting Johnson, defendant ran south through the alley. A friend drove Johnson to the hospital. Johnson asserted that during his hospitalization, he never lost consciousness.

In addition, during Johnson's direct examination testimony, he identified defendant as the man who had fired the gun at him. Johnson also stated that the police obtained a description of defendant from him. Johnson told the police that defendant was "dark-complected, tall, about six feet and approximately 210 pounds." He estimated that defendant was in his late twenties or early thirties. Johnson also informed the police that defendant was wearing a dark, three-quarter length leather coat and dark trousers.

On the day following the shooting, two uniformed police officers came to Johnson's hospital room in the intensive care unit and asked him if he felt well enough to view "a guy for identification." Johnson explained that at this time, he had "tubes in his nose," but he was not receiving blood or intravenous fluids. After Johnson indicated he felt "pretty good," four police officers and defendant entered the room. Johnson asserted that there were several lights turned on in his hospital room so that he could adequately see the defendant. Johnson looked at defendant's face and asked him to turn around and to speak. After defendant spoke two sentences, Johnson told the police that defendant was the man who had shot him. Johnson again identified defendant at trial.

Johnson further stated that he remained in the hospital for 31 days. After returning home, he searched through his garage and found an expended bullet near his car. Johnson testified that this bullet had been in his possession since he had found it. He brought the bullet to court and handed it to an assistant state's attorney. Johnson identified the expended bullet, and it was admitted into evidence over defendant's objection.

On cross-examination, Johnson acknowledged that there were no street lights in the alley where the hold-up and shooting incident occurred, and that neither his car headlights nor the other car headlights were turned on. Johnson also estimated that defendant had parked his car approximately four feet from Johnson's garage. Johnson admitted that, on the day of the incident, he saw defendant, for "only a few seconds" without the benefit of garage lights, street lights, or car headlights. He did indicate again, however, that there was sufficient daylight for him to see. Johnson further asserted that he "kept his eyes" on defendant throughout the incident. After defendant shot him and ran away, Johnson followed the defendant until the defendant turned the corner and Johnson lost sight of him. He then returned to where he lived. Johnson again stated that he never lost consciousness during the incident or his subsequent hospitali-

zation. Johnson also indicated he could not remember how many of the police officers who entered his hospital room with defendant were dressed in uniform. He knew four of the men were police officers because they identified themselves as police officers.

The next witness for the State, Police Officer Earl McClean, testified that on January 23, 1978, at approximately 5 p.m., he was patrolling the area near 71st and Yale Avenue. He received a radio message that at the location of 7131 South Yale there was a robbery victim who possibly had been shot. When he arrived at that location, he found an old Chevrolet parked in the alley. The garage door was open, and a car was parked inside the garage. There was blood on the ground. McClean also stated that when he arrived at the scene, around 5 p.m., it was late afternoon, and there was sufficient daylight so that he could see the surroundings. McClean also related the description of the defendant which Johnson had given him. He stated that when he saw Johnson in the hospital, Johnson was conscious. On cross-examination, McClean acknowledged that he did not recover any money or a gun from the Chevrolet car.

Investigator Edward Kendzior testified that on January 23, 1978, he went to St. Bernard's Hospital to interview Johnson. Johnson appeared to be alert. Kendzior also repeated the description of defendant which Johnson had given him. On January 24, 1978, Kendzior arrested defendant at a liquor store located near 72nd and Vincennes Streets.

At the police station where defendant had been taken, Assistant State's Attorney Ernest DiBenedetto suggested defendant be taken to St. Bernard's Hospital to be viewed by Johnson. He explained that Johnson could not be moved from the hospital. DiBenedetto, Kendzior, and two uniformed police officers brought defendant to St. Bernard's Hospital. DiBenedetto and Kendzior first entered Johnson's room. After Johnson told Kenzior he felt fine, Kendzior asked him if he could view a possible suspect. Johnson said he could, and he requested Kendzior to turn on the lights in the room. Kendzior asserted he had no difficulty communicating with Johnson.

The two uniformed police officers brought defendant into Johnson's room, and they stood approximately five or six feet from Johnson, who was "half sitting." Defendant was not handcuffed. Johnson requested defendant to turn. Kendzior then asked Johnson if he wanted defendant to speak and Johnson said yes. Defendant gave his address and Johnson raised his right arm and told defendant and the two uniformed policemen to leave. As they left, Johnson told Kendzior "that's the man who shot me."

Ernest DiBenedetto, the assistant state's attorney, testified he advised Kendzior to bring defendant to St. Bernard's Hospital so that Johnson could view him. Over defense counsel's objection, DiBenedetto repeated

the events surrounding Johnson's identification of defendant in the hospital room. The State then rested.

Armentha Dawkins, a Chicago bus driver and defendant's girlfriend, testified that on January 23, 1980, at 5:30 a.m., she left her home at 6128 N. Kenmore Avenue, where she resided with defendant, to go to work. She returned to her home at approximately 10:30 a.m. and again left for work at 3 p.m. During this time, defendant was watching television. When she returned home at 6 p.m., defendant was still watching television. He had informed her that he did not feel well due to asthma difficulties. She described defendant as "not breathing the way he usually does" and being unable to eat any food.

On cross-examination, Dawkins estimated that 71st and Yates Avenue is approximately 23 miles from her northside home. She then concluded that it would have been impossible for defendant to be in the area of 71st and Yates at 5 p.m., since she had seen him on the north side at 6 p.m.

Defendant testified in his own behalf. Defendant stated he was self-employed as a carpenter. Columbus Lewis had hired defendant to do remodeling work on Lewis' home located on the south side near the scene of the incident. Defendant was working at Lewis' home around the time of the incident. As another form of work, defendant "took phone calls" at his girlfriend's apartment, his father's home on the south side, and at the liquor store where he was arrested.

Defendant further asserted that on January 23, 1978, he did not go to work because he was not feeling well. He watched television most of the day and left his home once at 5 p.m. to go to a store located near his north side home. Defendant denied owning a gun or shooting Johnson. He also stated that he had never weighed 210 pounds and on January 23, 1978, he weighed 178 pounds.

Defendant also testified he never saw Johnson do anything while defendant was in Johnson's hospital room. Defendant acknowledged that he was not handcuffed while he was in Johnson's hospital room. He also stated that, at the time of the incident, he had a beard and a mustache.

On cross-examination, defendant asserted he did not own a car and he used public transportation to get to work on the south side. Defendant estimated that his traveling time from home to the south side was an hour and 15 minutes. Defendant also asserted that, at 4 p.m. on January 23, Darlene Harrison, a friend of his girlfriend, telephoned his home.

Darlene Harrison, who was sitting in the court room during defendant's cross-examination in violation of a court order excluding witnesses during prior trial testimony, also testified as a defense witness. She stated that she telephoned defendant's home on January 23, 1978; she could not recall the exact time of day, but she did talk to defendant.

Columbus Lewis testified he hired defendant to do carpentry work at his home on the south side during the month of January. Albert Hindmon testified that defendant also worked for him just prior to Christmas. The defense then rested.

In rebuttal, the State introduced a photograph of defendant taken while he was in the Cook County jail. The State also introduced a certified copy of defendant's 1975 conviction for unlawful use of weapons. After closing argument, the jury returned a verdict of guilty on both the attempt murder and the aggravated battery counts. The trial court sentenced defendant to the Department of Corrections for 12 to 15 years. This appeal followed.

OPINION

I

■■ Defendant first contends that the trial court abused its discretion and committed reversible error by allowing the State to impeach the defendant by admitting evidence of defendant's prior felony conviction for unauthorized use of weapons. Defendant argues that a felony conviction for unlawful use of weapons does not affect credibility and therefore should not have been admitted for impeachment purposes. A felony conviction, however, is admissible for impeachment purposes if certain conditions are met: (1) the prior conviction is punishable by death or imprisonment in excess of one year or the prior conviction involved dishonesty or a false statement; (2) the date of conviction or date of release from confinement, whichever is later, is not more than 10 years prior to the date of the present trial; and (3) the trial court, in the exercise of its discretion, determines that the probative value of the evidence for impeachment purposes is not substantially outweighed by the danger of unfair prejudice to the defendant by disclosing the prior conviction in the pending trial. *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695; *People v. Daily* (1979), 79 Ill. App. 3d 928, 398 N.E.2d 923.

Applying these factors, it is clear that the prior felony conviction was less than 10 years old and a felony punishable in excess of a year imprisonment. Defendant, however, argues that because the trial judge did not state he was balancing the probative value of the prior conviction against its prejudicial effect, the trial judge did not, in fact, weigh these factors. We disagree.

■■ As in *People v. Washington* (1973), 55 Ill. 2d 521, 304 N.E.2d 276, the record reveals a discussion of the *Montgomery* decision, the nature of the prior conviction, and a concern for the possible prejudicial impact of that prior conviction: the trial court instructed the jury to consider the evidence of the prior felony conviction solely for impeachment purposes and not as substantive evidence of defendant's guilt in the pending case.

While the trial court also specifically stated that it was exercising its discretion, there is no requirement that the trial court specifically evaluate, on the record, each relevant factor considered by it. (*People v. Washington* (1973), 55 Ill. 2d 521, 304 N.E.2d 276; *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 394 N.E.2d 1340.) In view of the foregoing, we conclude that the trial court did not abuse its discretion by admitting evidence of defendant's prior felony conviction. *People v. Daily* (1979), 79 Ill. App. 3d 928, 398 N.E.2d 923.

## II

### (a)

Defendant next contends the State failed to prove him guilty beyond a reasonable doubt since the only evidence contradicting this alibi testimony was the identification testimony by the complainant.

■■ The law is clear that where, as here, the identity of the accused is at issue, the testimony of only one witness is sufficient to convict, even if contradicted by the accused, provided that the accused is observed under circumstances which would allow a positive identification to be made. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) It is not required that the validity of the identification be based upon perfect conditions for observation or that the time for observation be of a prolonged nature. (*People v. Porter* (1975), 29 Ill. App. 3d 456, 330 N.E.2d 599; *People v. Jackson* (1974), 23 Ill. App. 3d 1011, 320 N.E.2d 400.) The key factor is to determine if the witness had an opportunity under adequate conditions to view the offender at the time of the commission of the crime. *People v. Reed* (1980), 80 Ill. App. 3d 771, 400 N.E.2d 688; *People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235.

In the instant case, Johnson viewed the defendant under circumstances which later permitted him to make a positive identification of defendant. Johnson testified he and defendant were standing "close enough to touch each other." Johnson continued observing defendant's face as defendant backed away from him. Both Johnson and Officer McClean testified that, at 5 p.m. on January 23, there was sufficient daylight to see objects without the need for artificial lighting.

In our view, Johnson's identification is legally sufficient to sustain defendant's conviction. Johnson viewed defendant for an adequate amount of time (see *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907 (five to 10 seconds); *People v. Porter* (1975), 29 Ill. App. 3d 456, 330 N.E.2d 599 (five to 10 seconds)), and he observed defendant under adequate lighting conditions. In marked contrast to *People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434, Johnson's identification testimony was neither vague nor uncertain.

■■ Defendant nevertheless argues that Johnson's identification testimony is not credible because the description of the assailant which Johnson gave to the police failed to include the fact that defendant had facial hair. Defendant also contends that Johnson incorrectly estimated defendant's weight. These factors alone, however, do not raise a reasonable doubt of defendant's guilt, but rather are to be weighed by the trier of fact in evaluating the identification testimony. *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318.

Defendant also argues that his alibi defense may not be disregarded. Defendant's alibi testimony, however, simply created an issue of fact for the trier of fact to resolve. (See *People v. Hammond* (1970), 45 Ill. 2d 269, 259 N.E.2d 44.) The law is settled that the trier of fact is not required to accept alibi testimony over the positive identification of a defendant even if the alibi testimony is presented through a greater number of witnesses. (*People v. Setzke* (1961), 22 Ill. 2d 582, 177 N.E.2d 168; *People v. Bullock* (1977), 51 Ill. App. 3d 149, 366 N.E.2d 475.) It is the jury's function, as trier of fact, to determine the credibility of the witnesses and the weight to be given their testimony. (See *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) Here, the evidence was not so improbable as to raise a reasonable doubt of the defendant's guilt and, therefore, we will not disturb the jury's determination. *People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227.

### (b)

■■ Defendant also argues that the pretrial showup in the hospital was unduly suggestive and conducive to an irreparable mistaken identification. Defendant, however, never raised this argument prior to or during trial, and the State contends he has waived the issue on appeal. The record discloses that defendant did raise the issue in his oral post-trial motion and the State failed to object to the oral presentation of the motion. An oral post-trial motion is sufficient to preserve the error if the State does not object to an oral presentation of the motion. (*People v. Muellner* (1979), 70 Ill. App. 3d 671, 388 N.E.2d 851.) We, however, conclude that whether or not defendant waived this issue is of no consequence since the record discloses that under the totality of the circumstances, Johnson's identification of defendant was certain and reliable and the pretrial showup did not lead to a substantial likelihood of irreparable misidentification.

As both the State and defendant correctly note, to determine the admissibility of identification testimony, "[r]eliability is the linchpin," and the court must consider the following factors against the "corrupting effect" of the suggestive identification: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of

attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253; see also *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.

Applying this test to the instant case, it is readily apparent that Johnson's identification was reliable. First, we have previously concluded that Johnson had an adequate opportunity to view his assailant at the time of the offense. Second, Johnson's detailed description of the events indicates he was closely attentive to the incident taking place. (*People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.) That he was the victim obviously "evinces the conclusion that he was cognizant of the gravity of the scene." (*People v. McTush* (1980), 81 Ill. 2d 513, 522, 410 N.E.2d 861, 865.) Third, the minor discrepancies in Johnson's description of defendant which he gave to the police do not diminish the reliability of Johnson's identification testimony. (*People v. McTush.*) Fourth, after defendant was brought to Johnson's hospital room and spoke a few words, Johnson was certain defendant was the offender. Fifth, the time between the confrontation and the crime was only one day. These indicators of Johnson's ability to make an accurate identification are hardly outweighed by the alleged corrupting effect to the challenged identification itself.

■■ Finally, we note that during trial, Johnson identified defendant as his assailant and asserted that he could identify defendant because defendant was the man who shot him. Johnson had an excellent opportunity to view defendant face-to-face during the shooting incident. In our view, Johnson's testimony established that there was a reliable independent basis for his in-court identification and the hospital showup did not lead to a substantial likelihood of misidentification. *People v. McTush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861; *People v. Kirk* (1979), 76 Ill. App. 3d 459, 394 N.E.2d 1212.

Since we have concluded that the pretrial identification was constitutionally valid, the alleged suggestiveness in the procedure affects only the weight of the identification testimony. (*People v. Caliendo* (1980), 84 Ill. App. 3d 987, 405 N.E.2d 1133.) Here the jury heard the testimony of the witnesses and observed their demeanor and they chose to believe the testimony of Johnson. We find no reason to reverse that determination.

### III

Defendant next contends the trial court abused its discretion by denying his motion for a new trial on the basis of newly discovered evidence. We disagree.

During argument on defendant's post-trial motion, defense counsel

informed the court that "[i]t had come to my attention during the progress of the trial and almost at the close that Mr. McKinley Johnson wears glasses." Defense counsel further explained that she "ran" into Johnson in the corridor "after the testimony had begun." Johnson then told defense counsel that he needed the glasses for reading.

A motion for a new trial based upon newly discovered evidence is not looked upon with favor by the courts and to prevent fraud and imposition " '* * * which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, * * *' " the application must be subjected to close scrutiny by the court. (*People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288, 292.) It is the applicant's burden to rebut the presumption that the verdict is correct and to show that there has been no lack of due diligence on the applicant's part. *People v. Carpenter* (1979), 74 Ill. App. 3d 770, 393 N.E.2d 50.

To warrant a new trial, the newly discovered evidence must be of such a conclusive character that it would probably change the result on retrial. In addition, the evidence discovered must be material to the issues and not merely cumulative. Finally, the evidence must have been discovered since the trial and be of such character that it could not have been discovered by the exercise of due diligence prior to trial. (*People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1; *People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338.) The decision to grant or deny a motion for a new trial is largely discretionary with the trial court and the exercise of this discretion will not be disturbed by a court of review except in the case of manifest abuse. *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288; *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.

Here, defendant has failed to show that the trial court's decision was a manifest abuse of discretion. At trial, and on appeal, defendant has failed to demonstrate that he met his burden of first rebutting the correctness of the verdict and second showing that there was no lack of due diligence in failing to discover the complainant's use of eyeglasses.

With respect to the first aspect, defendant argues that there would be a different result on retrial because he would be given "a fair opportunity to impeach the complaining witness' identification of his assailant in front of the finder of fact, the jury." The supreme court, however, has drawn a distinction between newly discovered evidence which impeaches a witness in the sense that it affects credibility and evidence which is probative in that it presents a set of facts which differs from that to which the witness previously testified. Only the latter type of evidence provides a basis for new trial when it appears that such new evidence has sufficient probative force or weight to produce a result different from that obtained at the original trial. (*People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338.) Newly discovered evidence which only has the effect of

impeaching, discrediting, or contradicting the witness does not afford a basis for a new trial. *People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338; *People v. Carpenter* (1979), 74 Ill. App. 3d 770, 393 N.E.2d 50.

Since the evidence here would only have the effect of possibly discrediting Johnson's identification testimony, assuming defendant could show Johnson needed eyeglasses to see objects at a distance, and not only for reading, we cannot find that such "newly discovered evidence" affords a basis for granting a new trial.

■■ In addition, we note that defense counsel did not act diligently in presenting this evidence to the trial court. Although defense counsel discovered the evidence during trial, she waited until after an adverse jury determination to bring the evidence to the court's attention. While the due diligence requirement pertains to the discovery of the new evidence, the fact that defense counsel delayed presenting the evidence tends to render suspect defendant's application for a new trial as a last resort to escape the consequences of an adverse verdict. *People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338.

Under these circumstances, we conclude the defendant has not met his burden, and the trial court's ruling was not a manifest abuse of discretion.

### IV

■■ Defendant contends and the State concedes that the trial court erred in entering judgment on the guilty verdict for aggravated battery since judgment was entered on the guilty verdict for attempt murder. Both crimes arose out of the same conduct, and aggravated battery is a lesser-included offense of attempt murder. (*People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387. See also *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) Thus, defendant's convictions for both aggravated battery and attempt murder were improper. (*People v. Walker* (1975), 26 Ill. App. 3d 955, 326 N.E.2d 63. See also *People v. Smith* (1978), 59 Ill. App. 3d 480, 375 N.E.2d 941.) Accordingly, the judgment of conviction on the lesser crime of aggravated battery is ordered vacated.

### V

Defendant next contends that a new sentencing hearing is required because he was sentenced to a prison term for both convictions. Defendant's argument is based on the trial court's statement that the aggravated battery conviction "merged" with the attempt murder charge. From this statement, defendant infers that he was sentenced for both crimes. We disagree.

The record clearly discloses that the trial court sentenced defendant only on the attempt murder conviction. After stating that the offenses had

merged, the trial judge informed defendant the court would "deal only with the attempt murder charge in sentencing." The trial court considered the nature and circumstances of the crime and concluded that defendant had committed a violent and serious crime. The trial judge also explained the sentences which could be imposed for attempt murder under both the prior and present sentencing codes. We find nothing in the record to indicate the trial court abused its discretion in sentencing defendant. *Cf. People v. Calvert* (1980), 82 Ill. App. 3d 350, 402 N.E.2d 638.

Accordingly, for the reasons expressed, we affirm the defendant's conviction and sentence on the charge of attempt murder. We vacate the defendant's conviction on the charge of aggravated battery.

Affirmed in part, vacated in part.

JOHNSON and ROMITI, JJ., concur.